514 P.2d 720

The STATE of Arizona, Appellee,

v.

Kenneth CLAYTON and Herbert Penrod, Appellants.

No. 2283.

Supreme Court of Arizona,
In Banc.

Sept. 27, 1973.

Rehearing Denied Oct. 30, 1973.

————◆————

Gary K. Nelson, Atty. Gen., Phoenix, by Howard L. Fell, Tucson, and Louis A. Moore, Jr., Asst. Attys. Gen., Phoenix, for appellee.

Cohen, Gerst, Groseclose & Meissner by David A. Groseclose, Phoenix, for appellants; Ramon R. Alvarez, Douglas, of counsel.

CAMERON, Vice Chief Justice.

This is an appeal from jury verdicts and judgments of guilt as to each defendant to the crimes of burglary in the nighttime, § 13–302, subsec. B A.R.S., with sentences thereon of from 14 to 15 years; and first degree murder, § 13–452 A.R.S., with sentences of death.

Omitting the questions concerning the death penalty which have been disposed of by the United States Supreme Court cases of Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972) and Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972), we are called upon to answer the following questions on appeal:

1. Was there error in the empaneling and qualification of the jury?

2. Were the defendants denied their right to a public trial where the courtroom door was locked during a part of the voir dire of the jury?

3. In a prosecution for felony murder where there is evidence that the defendants had abandoned the felony of burglary and were surrendering should the trial court have instructed the jury on second degree murder and manslaughter?

4. Was it error for the court to fail to declare a mistrial when the County Attorney impeached his own witness?

5. Were defendants' constitutional protections against double jeopardy violated where, at the close of the State's case, a count alleging first degree murder was stricken on motion of the prosecutor leaving for the jury the separate count alleging murder under the felony-murder rule?

6. Was it error for the court to have failed to instruct the jury that if the felony of burglary had been abandoned or terminated or that the defendants were attempting surrender then the felony-murder rule had no application?

7. Was it error to give the "stipulated instruction" on the grounds that it constituted a comment on the evidence and did not correctly state the law with reference to self-defense?

8. Was it error for the trial court to deny the motion in arrest of judgment on Count I, burglary, under the doctrine of collateral estoppel?

9. Was it error to submit 3 forms of verdict as to the murder charge?

10. As to the defendant Clayton: Was Clayton coerced to testify on his own behalf?

11. As to the defendant Penrod:

(a) Was there corroboration of either accomplice to support the conviction of the defendant Penrod?

(b) Was it reversible error to refuse the motion of the defendant Penrod for a separate trial?

The facts necessary for a determination of this matter on appeal are as follows. On the evening of 3 October 1970, the defendant, Herbert Penrod, drove to the residence of Richard Evans in Sierra Vista, Arizona, picked him up, and from there they went to the residence of the defendant Kenneth Clayton in Benson, Arizona. The three had previously met as members of a motorcycle club called "The Soul Sinners." The three evidently decided to bur-

glarize some establishment although they had no particular place in mind. Taking burglar tools, a pistol, and a shotgun, they drove from Benson on U.S. Highway 80 to the area of Bisbee and Lowell, Arizona, and then took Highway 92 back toward Sierra Vista, Arizona. After traveling several miles they passed a restaurant known as "The Brite Spot" which is located approximately halfway between Bisbee Arizona, and Sierra Vista, Arizona. They noticed at that time a Volkswagen parked in front of "The Brite Spot" and continued on for a short distance and then returned to the area and noticed that the Volkswagen was gone. They concealed their automobile on a side road which led to the home of Robert Cline, Sr., the decedent, who was also the owner of "The Brite Spot." They succeeded in opening the back door of "The Brite Spot" with a crowbar and entered the kitchen area. A silent burglar alarm went off in the home of Robert Cline, Sr., who lived about a quarter of a mile away. Robert Cline, Sr., called the Cochise County Sheriff's Office and together with his son-in-law, both armed, drove toward "The Brite Spot" with their lights out. Because the lights were out their car became stuck in a cattle guard and they then proceeded to "The Brite Spot" on foot. Cline covered the back while the son-in-law covered the front of the building. Cline called to the burglars to come out and, according to the testimony of the codefendant Evans, the defendant Clayton started to the door with a shotgun in his right hand and with his hands over his head. As he came out the door there was a gun blast and Clayton fell and stumbled back into the kitchen. The testimony of Richard Evans continued:

> "I remember thinking that the shot had come from outside through the window. He fell backwards, grabbing his head, and I could see blood starting to run down his forehead. He said, 'He shot me' or 'He got me', I don't recall the exact words, and then turned."

After the defendant Clayton was struck by the blast, evidently from Robert Cline's shotgun, Clayton then fired at Cline. Cline fired again and Clayton fired a second time. At this point the defendants observed a car rapidly approaching and fled from the building to their car parked by a nearby dump. The car would not start and they fled on foot. They were apprehended the following day having been followed from the scene of the crime. Robert Cline, Sr., was found dead outside of "The Brite Spot."

The three defendants were charged with Count I, burglary in the first degree, § 13–302, subsec. B A.R.S.; Count II, first degree murder, §§ 13–451 and 13–452 A.R. S.; Count III, murder under the felony-murder rule, § 13–452 A.R.S. Count II was stricken upon motion of the County Attorney at the close of the State's case. The defendant Evans testified on behalf of the State in return for being allowed to plead guilty to burglary and manslaughter. Penrod and Clayton were tried jointly.

The jury found both defendants guilty of Counts I and III and assessed the death penalty as to Count III. Both defendants appealed.

## EMPANELING THE JURY

Defendants first contend that it was error for the court to deny challenges or, in absence of challenges, upon its own motion to fail to dismiss for cause 11 of the jurors passed.

The law in Arizona concerning the disqualification of jurors has been stated as follows:

> "A prospective juror may be disqualified if he is biased for or against defendant § 21–211, subsec. 4, if he holds an unqualified opinion, Rule 218, or if his opinion will prevent him from acting with entire impartiality Rule 219, subsec. 13. If his opinion is based upon rumor or news reports about the truth of which he has expressed no opinion, he is competent to be a juror if he swears he can fairly render a verdict and the court is satisfied of the truth of such statement. Rule 220. (footnote omitted)

"A prospective juror need not be disqualified unless his opinion is unqualified. Such an opinion is defined as a fixed, settled and abiding conviction as to the guilt or innocence of the defendant. Where the opinion is less strong it is qualified and the court will inquire into its strength and the information upon which it is founded. That the juror will carry an opinion into the jury box or that it will take evidence to remove it are not, in themselves, grounds for disqualification. Leigh v. Territory, 10 Ariz. 129, 85 P. 948. Cf. Stephens v. State, 20 Ariz. 37, 176 P. 579. This court has also held that a disqualifying opinion must be, not merely that, if what the juror has heard is true a certain conclusion as to the guilt or innocence of the defendant necessarily follows, but that what he has heard is true as a matter of fact, and that such belief as to its truth would follow him into the jury box and would be considered by him in determining the verdict he would return. Burnett v. State, 34 Ariz. 129, 268 P. 611. The trial court decides during the voir dire whether a juror's opinion is fixed and will influence his decision. The determination depends, in large part, upon an observation of the prospective juror's demeanor and the tenor of his answers. Therefore, we have long held that a ruling upon a motion challenging a juror for bias or partiality is left largely within the sound discretion of the trial court whose decision will not be overturned in the absence of a clear showing of an abuse of that discretion. State v. Brady, 66 Ariz. 365, 189 P.2d 198. * * *" State v. Narten, 99 Ariz. 116, 122, 407 P.2d 81, 85 (1965), cert. den. 384 U.S. 1008, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966).

■ Absent a challenge for cause we will not consider upon appeal the failure of the court, on its own motion, to dismiss a juror for cause unless it is such an abuse of discretion as to constitute fundamental error. § 13–1715 A.R.S.; State v. Burrell, 96 Ariz. 233, 393 P.2d 921 (1964).

Early in the jury selection process the trial court stated as follows:

"THE COURT: I might indicate to the entire jury that we do have a number of problems in connection with this case. That we do not have a large number of jurors available and it is for that reason that the Court has some reluctance in excusing you in this particular case. I just wanted to let you know that normally, almost any reason has been accepted by the Court for excusing you. It is because of the limited number that we have available in this case that the Court does have some reluctance in excusing you."

We have gone over the selection of the jury paying particular attention to all the jurors the defense contends on appeal should not have been passed for cause. Jurors numbered 5, 16, 20, 30, 31, 38, 42, and 49 were not challenged for cause though some were preemptorily challenged by the defendants. Some of the jurors had outside problems such as a death in the family, but these problems did not indicate that the jurors could not be fair and impartial triers of the facts. We find no fundamental error in the passing of these eight jurors not challenged by the defendants at the jury selection.

■ Juror No. 2 was challenged for cause because as she stated:

"Q Would it be your clear and definite opinion then, Mrs. Schork, that you could not impartially administer the law and apply the law of self-defense in this case?

"A I really don't think I could, not if it was that way."

The court personally addressed juror No. 2:

"Q I am just asking you the abstract question whether you would not be willing to accept the Court's instruction and try to follow the Court's instruction.

"A I would try to follow them and try to understand.

"Q And regardless of how Mr. Alvarez might state the laws of self-defense to be to you or how Mr. Winkler or Mr. Riley might state the law of self-defense to you, that under the law you are to follow the instructions which the Court tells you is the law.

"A Yes.

"Q And that despite any preconceived idea that you might have about what the law is, you think you would have any difficulty in doing that?

"A I would try not to. That's all I can say. I will try to follow the law the way it is, is all I can say."

We believe that juror No. 2 was rehabilitated and it was not error to refuse to dismiss her from the jury panel.

■ Defendants next contend that juror No. 7 indicated that she could not render a fair and impartial verdict for the reason that it would be inconvenient for her to be away from home because her children were 13 and 17 and there was no other person in the household to care for them during the period of time that the jury would be sequestered. Objection was made to this juror. Although it was inconvenient for juror No. 7 to appear, in answer to the question as to her duties she stated:

"A Yes, I expect, if I am selected, I have no choice but to follow the rules of the Court.

"Q Would you feel some hesitancy in following the rules of the Court, Mrs. Mauk?

"A No.

"Q And you would then apply them fairly to both the State of Arizona and to Kenneth and to Herb?

"A I would."

We find no error in passing juror No. 7 for cause.

■ Defendants next challenge juror No. 25, Mrs. McRae. Mrs. McRae indicated that she had read or heard something about the case in the newspapers and that she had known the Clines back in the '40's. She stated:

"A Well, I knew the people. I was—I first knew them way back in the '40's. We met in the Bank of Bisbee, and we were sort of—had parallel lives. They were starting a new business in Palominas. We were starting one in St. David, and we know the type of hard work it took for them to build their business and what it takes to build a business and this I know.

"Q Well, do you think that because of your friendship—you are speaking of the Cline family?

"A I am not—I am not a friend, I mean, it's an acquaintance. I knew them as business people.

"Q Well do you think that because of the acquaintance as business people that you had with them that you would feel uncomfortable about sitting on the jury in this case?

"A Well, I don't believe I could give a fair—for anyone that was guilty, I couldn't be fair about it, because I know how hard it is to work and to build and to do what these people did.

"Q Do you feel that becuase these two defendants are charged with the murder of Robert Cline, Sr., that you would be unable to give a fair and impartial trial to them as a trial juror?

"A I feel that they are innocent in my estimation. I do not know the boys, but I would be inclined to feel that whoever did this was—should get the full extent of the law."

And also in response to questions by Mr. Alvarez:

"Q And then he asked the next question, whether you felt that the acquaintance with Robert Cline would preclude a fair consideration of this case, and I have you as having answered that question affirmatively, answering it yes also.

"A Well, like I say, I do not know the boys and I feel like if they are innocent, then I would go all the way in their behalf, but whoever was guilty of this, I feel that—should have the full extent."

The County Attorney examined the witness as follows:

"Q Mrs. McRae, do you know what the facts are in this case?

"A Not really.

"Q Have you made up your mind that these two fellows behind me are guilty?

"A No, I haven't. I don't know that they are guilty.

"Q Are you willing to sit as a juror and listen to all the facts with an open mind, weigh all the evidence with an open mind, without just closing your mind against them right away?

"A No. I have always had an open mind with things. I don't—I am not narrow in the way I think.

"Q You are willing then to have an open mind in this case?

"A Yes, I am.

"Q And you are willing to sit here and listen to the testimony and make a decision at the close of the case as to what the facts were?

"A Yes.

"Q Now have you ever sat as a trial juror before?

"A No, I haven't sir.

"Q Mrs. McRae, at the close of a jury trial, the Judge tells the jurors what the law is in the case. As you know, that law library nextdoor is loaded with law books, and the Judge sort of distills all the law that—pulls out what applies to this particular case, and he says these are the principles of law that you are to apply when you determine guilt or innocence.

"A Yes.

"Q Are you willing to listen carefully to what Judge Helm tells you is the applicable law and follow it?

"A Yes, sir.

"Q All right. Now let's go one step beyond that. Let's suppose that you heard all the facts, all the testimony, state's witnesses, the defense witnesses, if any, you had exhibits in front of you, pictures, diagrams, things like that, and the Judge instructed you that there are different degrees of murder, or homicide. There is murder in the first degree, murder in the second degree, and manslaughter, what is known as voluntary manslaughter, involuntary manslaughter, the law of self-defense is such and so, and that these—you may find that—that Bob Cline was the aggressor and that if this was the case, and if these gentlemen felt their lives were in danger they had the right to fight back, and would you automatically say murder in the first degree?

"A No."

We believe that Mrs. McRae was properly rehabilitated and that the trial court did not abuse its discretion in failing to sustain the challenge for cause by the defendants as to Mrs. McRae.

■ A reading of the voir dire of the jury panel indicates that while the jury was not a perfect jury, it was a fair and impartial jury. The fact that there was a limited number of jurors available resulted in some jurors' being retained who might not normally have been retained, as for example, those with certain household problems, death in the family, etc., and while this may have been an imposition upon certain of the jurors selected, we find no prejudice to the defendants in requiring such jurors to remain on the jury panel.

### WERE DEFENDANTS DENIED THEIR RIGHT TO A PUBLIC TRIAL?

■ During the voir dire of the jury, at which time there were spectators in the

courtroom as there had been throughout the voir dire examination, it was noticed that in order for one of the jurors to get out of the courtroom she had to knock on the door. The matter was brought to the attention of the judge who indicated that he was unaware of the problem and the door was unlocked. The reporter's transcript indicates as follows:

"MR. ALVAREZ: If Your Honor please, I just noticed right now when Mrs. Judy Smith came over that apparently this door has been locked, and I was not aware of it until she knocked. Has it been throughout the selection of the jury?. Right now that—that door has been locked, and the public has not been admitted.

"THE COURT: I don't know that. There are people in here.

"MR. ALVAREZ: Well, there are some in here, right now, but the door apparently has been locked.

"THE COURT: There is no reason for it.

"MR. ALVAREZ: I realize this, Your Honor.

"THE COURT: It can remain open. However, we might have some difficulty in having some of the jurors come in. I don't know. However, there is no reason why anybody can't come in. As a matter of fact, I so told some deputy sheriffs this morning."

The locking of the door was inadvertent and apparently of short duration and we find no denial of a right to a public trial under the facts in the instant case. State v. Von Reeden, 104 Ariz. 404, 454 P.2d 149 (1969).

## FAILURE TO INSTRUCT ON SECOND DEGREE MURDER AND MANSLAUGHTER

Defendants contend that under the facts of the case it was reversible error to fail to instruct the jury on second degree murder and manslaughter.

The trial court should instruct the jury on every degree or grade of the offense which is supported by the evidence, State v. Brady, 105 Ariz. 190, 461 P.2d 488 (1969); State v. Sorensen, 104 Ariz. 503, 455 P.2d 981 (1969), and there is a duty to instruct the jury on inferior degrees of homicide suggested by the evidence even though no request has been made. State v. Madden, 104 Ariz. 111, 449 P.2d 39 (1969).

Our statute reads:

"A murder * * * which is committed in the perpetration of, or attempt to perpetrate, * * * burglary * * *, is murder of the first degree. All other kinds of murder are of the second degree." § 13–452 A.R.S.

And we have stated:

" * * * The jury may not be instructed on a lesser degree of murder than first degree where, under the evidence, it was committed in the course of a robbery. State v. Folk, 78 Ariz. 205, 277 P.2d 1016; Burgunder v. State, 55 Ariz. 411, 103 P.2d 256; State v. Cochrane, supra. * * * " State v. Kruchten, 101 Ariz. 186, 196, 417 P.2d 510, 520 (1966).

Defendants, however, contend that the facts in the case indicated the burglary was terminated and the defendants were trying to surrender when the shooting occurred.

The trial court instructed on self-defense based upon evidence that the defendants had been trying to surrender at the time the victim fired the first shot. Under the facts presented at the trial and after the striking of Count II of straight first degree murder, the defendants were then faced with an all or nothing situation. If the jury believed the burglary had been completed and the defendants were trying to surrender and had communicated that desire to the victim Cline, then the jury could find the defendants not guilty of first degree murder under the felony-murder rule, § 13–452 A.R.S. The jury found otherwise. Under the instructions given,

they found that the defendants had committed a burglary and were still in the process of committing the burglary when the shooting occurred and the defendants were guilty of first degree murder, the only degree of murder for which they could be found guilty under the felony-murder rule and the facts in the instant case. § 13–452 A.R.S.

We find no error in the failure to give instructions on second degree murder and manslaughter.

## MISCONDUCT OF THE COUNTY ATTORNEY AND THE ADMISSION OF STATE'S EXHIBIT NO. 35

Defendants contend that the County Attorney was guilty of misconduct in impeaching his own witness, Evans, who had pled guilty and was testifying for and on behalf of the State against the two codefendants Clayton and Penrod.

There was some evidence that at the time of capture one of the "deputies" had placed a rope around the neck of defendant Penrod and dragged him through the bushes while the "deputy" was still on a horse. It was never determined whether this was a "deputy" of the Sheriff's Department, one of the sheriff's posse members, or merely an individual who was assisting in the search. It was agreed, however, informally in chambers by both the State and the defense, that no reference would be made to this fact.

During the examination of the defendant Evans by the State the following occurred:

"Q Now, how long after you—well, where were you taken after you were captured?

"A Well, the two men who came over the—or through the bushes tracking us, when they spotted us, drew their guns, and Penrod and I were together at that time, and we stood up with our hands up, and they took my automatic from us, and our jackets, and shirts, and marched us up through the bushes another couple hundred yards. There was a border patrol car, and another law enforcement car, and I guess 30 or 40 deputies wandering around.

"Q Now, why hadn't you buried your automatic?

"A I wasn't really thinking clearly at that time, and I didn't have it loaded, and I still sort of halfway thought I was going to get home.

"Q Okay. Now, where were you taken though, where were you and Mr. Penrod taken?

"A As I say, they took us up to the area where the posse members and border patrol, and another law enforcement car was, and took our boots and socks and shirts and emptied our pockets, and let us keep our levi's, locked us up in the back of the car.

"Q All right. And where did you go in the car?

"A From the car some deputies pulled us out and threw ropes around our necks and started off dragging Mr. Penrod behind a horse through the bushes, at the same time asking us where Clayton was.

"Q And where did—how long had—did this take place, or how long did that take?

"A Just a couple of minutes. Shortly after they begun dragging Mr. Penrod it come over the radio they had found Mr. Clayton. They brought us back to the car.

"Q And where did they take you?

"A From there we went to the Sierra Vista Hospital. They said Mr. Clayton had been taken there.

"Q And were you examined at the hospital?

"A I was not. I remember seeing Mr. Clayton wheeled in on a gurney into the emergency room. Mr. Penrod could barely talk. He had rope burns on his throat, and back of his arms were pretty badly skinned up. He asked to see the doctor. Said he

had a sprained ankle. They took him into the emergency room.

\* \* \* \* \* \*

"Q I'm going to show you State's Exhibit 35 for identification and ask you if you recognize that?

"A Yes, it's Mr. Penrod.

"Q Is that how he appeared on October 4th?

"A Yes, it is."

The photograph of Penrod, Exhibit No. 35, did not show any marks around his neck.

And:

"Q (By Mr. Riley) Mr. Evans, you have told us that Mr. Penrod was pretty much roughed up, is that correct?

"A Yes, sir.

"Q Rope thrown around his neck and dragged?

"A Yes, sir.

"Q And so badly injured that he couldn't talk?

"A He was having difficulty speaking.

"Q And this was because of this mistreatment he had received at the hands of the law enforcement officers?

"A Yes, sir, the strain of the rope on his throat.

"Q Uh-huh. Now, do you know when this picture was taken?

"A Not exactly. I imagine it was taken the same afternoon we were arrested, the same time my picture was taken.

"Q Can you point out on this picture the marks, wounds, abrasions, lacerations, or any other signs of injury on Mr. Penrod?

"MR. ALVAREZ: If Your Honor please, I am going to object—

"MR. MORRISON: If Your Honor please—

"THE COURT: Just a minute.

"MR. ALVAREZ: Excuse me, Bob.

"MR. MORRISON: Go ahead.

"MR. ALVAREZ: If Your Honor please, this is highly improper. He is attempting to have testimony taken from the photograph itself, and in addition, I thought we had an agreement that we weren't going into this question of the rope burns and the deputy dragging him around. That was my understanding.

"MR. RILEY: Your Honor, I didn't go into it. This witness slipped this in on the state with an attempt to help out his buddies, and I think this photograph is relevant and material at this time because I think it clearly shows, or doesn't show, these alleged injuries."

The court then excused the jury for the evening and the County Attorney stated:

"MR. RILEY: Your Honor, it came as more of a surprise to me, I think, than anyone, because I sat there in my office, at the recess, and gave Mr. Evans a list, and this is the original, and this is the one I gave him, of the topics we were going to cover on his testimony. I had talked to him several times before, and there is nothing on here about Penrod being mistreated. It was not discussed, and it was a surprise to the State of Arizona, because I was caught unprepared. \* \*, \* "

The court then also stated, concerning the prior agreement not to mention the roping incident, as follows:

"THE COURT: I think that it was just a discussion among counsel and the Court along the lines that has been discussed here, and I think that at that time a determination was made by the attorneys that they did not plan, either of them, and I am talking about the defense attorneys and the county attorney, did not intend to use this because it was entirely a collateral matter. There was some question about responsibility for it. There are a number of items that

were involved, and consideration was given, I thought, also to the fact that it was more or less a collateral matter not involving the question of the commission of the crimes with which the defendants were charged.

Now, insofar as the status of the proof is concerned at the present time, the motion for a mistrial by both the defendants Penrod and Clayton, will be denied, if the motion is based, as is the Court's understanding, on misconduct by the county attorney in the presentation of proof. I can't see that there was such misconduct. It is very apparent counsel was taken by surprise in the matter. * * *"

The defendant Evans who had plead guilty to the crime of burglary and manslaughter, evidently surprised and was adverse to the State's position. We find no error in the cross-examination and impeachment of the witness Evans in the manner indicated in the transcript. State v. Lane, 69 Ariz. 236, 211 P.2d 821 (1949). We have stated:

"Generally, one may not cross examine his own witness. The court in the exercise of sound discretion may permit one to cross examine his own witness upon an adequate showing of surprise, or that the witness is hostile to the party calling him or unwilling to testify. State of Arizona v. Guerrero, 58 Ariz. 421, 120 P.2d 798; General Petroleum Corp. v. Baker, 77 Ariz. 235, 269 P.2d 729. * * *" State v. Narten, supra, 99 Ariz. at 121, 407 P.2d at 84.

We find no error in the failure to grant the mistrial.

## DOUBLE JEOPARDY

The defendants were charged with three counts: Count I, a charge of burglary in the nighttime; and Count II, reading as follows:

"Kill one Robert Cline, Sr., a human being, with malice aforethought, contrary to A.R.S. 13–451, 13–452 and

## COUNT III

"Kill and murder Robert Cline, Sr., a human being, in the perpetration of the burglary of the 'Brite Spot,' Palominas, Cochise County, Arizona, contrary to A. R.S. 13–452."

After the State had rested its case, the State moved for a dismissal of Count II of the indictment, first degree murder. There is no question that jeopardy had attached, State v. Stout, 5 Ariz.App. 271, 425 P.2d 582 (1967), but we do not agree with the contentions of the defendants that the dismissal of the first degree murder charge constituted an acquittal of the murder in Count III. Count II reads in the traditional first degree murder charge, murder that is "willful, deliberate and premeditated."

Count III restates the felony-murder rule as provided by statute, that a murder committed in the perpetration of burglary is murder in the first degree. § 13–452 A. R.S.

Rule 128 of the Rules of Criminal Procedure, 17 A.R.S., specifically allows "different statements of the same offense." At the close of the State's case, the State elected to stand on first degree murder under the felony-murder rule rather than first degree murder based upon premeditation. The felony-murder rule dispenses with the required showing of premeditation as the act of committing a felony supplies the premeditation necessary for first degree murder. In dismissing Count II the State ran the risk that if the jury did not find the defendants guilty of first degree murder under the felony-murder rule, they would not be allowed to find them guilty of second degree murder or manslaughter.

The County Attorney evidently felt, and the court agreed, that the facts would not support a premeditated murder count and it was properly dismissed and the jury allowed to consider only murder committed in the perpetration of a burglary. We find no violation of the double jeopardy requirements or any prejudice to the defendants in the granting of this motion.

## FAILURE TO INSTRUCT THAT FELONY-MURDER RULE HAS NO APPLICATION IF DEFENDANTS HAD ABANDONED THE BURGLARY

The defendants contend that the jury should have been instructed that if the jury found the killing occurred after the intention to burglarize had been abandoned and while they were attempting to surrender, the felony-murder rule would not apply. No instruction was requested on this point and the defendants contend that the court should have sua sponte given an instruction covering this point and that the failure to do so constitutes fundamental error. The jury was instructed on the plea of self-defense. We find no error.

## ERROR IN THE "STIPULATED INSTRUCTION"

At the settling of the instructions, the attorneys for the State and the defendants stipulated that an instruction be given in lieu of other self-defense instructions submitted or considered by the parties. The first part of the instruction reads:

"If you find that the defendants, Herbert Penrod and Kenneth Clayton had burglarized the building known as the 'Brite Spot' and were withdrawing from the scene of the crime when they were confronted by the deceased, Robert Cline, Sr., *and that the defendant Kenneth Clayton intended to surrender to capture, and had communicated that intention to the deceased, Robert Cline, Sr., either by word or action,* and that thereafter the said Robert Cline, Sr., fired upon the defendant, Kenneth Clayton, then Kenneth Clayton was under a duty to retreat, if a reasonable avenue of retreat was open to him." (Emphasis ours)

It is the contention of the defendants that this stipulated instruction, and particularly the emphasized portion, constitutes a comment on the evidence contrary to Art. 6, § 27 of the Arizona Constitution A.R.S. and

is therefore fundamental error. Defendants' brief states:

"A correct statement or instruction would have been an abstract statement of the law, but no comment should have been made by the court as to the existence or non-existence of certain facts as was done in the first paragraph, and as such it constituted a comment on the evidence which is contrary to Arizona law."

It is clear that the instruction points out to the jury that if they find certain things then they may also find that Kenneth Clayton was justified in firing, etc. We do not believe this is a comment on the evidence.

## FAILURE TO DENY THE MOTION FOR ARREST IN JUDGMENT

Our statute reads:

"An act or omission which is made punishable in different ways by different sections of the laws may be punished under either, but in no event under more than one. An acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other." § 13–1641 A.R.S.

It is the contention of the defendants that because the crime of burglary is included within the charge this is double punishment for but one offense.

Under this statute we have held that the State may not rely upon one act to support multiple convictions of crimes with identical components. State v. Mays, 108 Ariz. 172, 494 P.2d 368 (1972); State v. Jernigan, 108 Ariz. 97, 492 P.2d 1204 (1972); State v. Mendoza, 107 Ariz. 51, 481 P.2d 844 (1971); State v. Hill, 11 Ariz.App. 230, 463 P.2d 125 (1969).

In the instant case they committed a homicide. The fact that the burglary supplies the premediation necessary for first degree murder does not make it part of the same offense. This case may be distinguished from the situation in Mendoza, supra, where the statute defining

first degree rape as rape where the victim is prevented from resisting by threats of "immediate and great bodily harm," § 13–611, subsec. A, par. 3, A.R.S., and the defendant was charged with first degree rape and assault with a deadly weapon based upon the same threats used to commit the rape. In that case we stated:

> " * * * In the instant case, it is clear that the element of force or violence necessary to the crime of 1st degree rape was supplied by the fear of personal violence induced by the defendant's usage of a deadly weapon, to wit: the knife, and without such usage that element of 1st degree rape would not exist. * * *" State v. Mendoza, supra, 107 Ariz. at 55–56, 481 P.2d at 848–849.

■ In the instant case the statute defines the crime of felony murder or murder committed in the course of a burglary as a separate crime in addition to the crime of burglary. They are separate offenses—one committed against the person and the other committed against the property of another. Where the offenses are so closely intertwined, as for example assault with a deadly weapon which results in a homicide, the statute may apply. Where the offenses are separate the statute does not apply.

The motion in arrest of judgment was properly denied.

## ERROR IN FORMS OF VERDICT

■ As to the murder charge the trial court submitted three forms of verdict—one of guilty with the death penalty, one guilty with life imprisonment, and one not guilty. Defendant contends that this over-emphasized the guilty aspect of the case by 2 to 1. Defendant contends that the proper form with reference to guilt should have been: "Guilty of murder in the First Degree and fixed the penalty at ———————."

We disagree with defendants' allegation of over emphasis. Our Court of Appeals has stated:

> "Although the better practice which is now followed by practically all Arizona trial courts is to submit forms of verdicts to the jury for their convenience, the law does not require that this be done. However, when the court submits verdict forms to the jury, then the forms must show every kind of verdict that may be returned by the jury. State v. Griffith, 92 Ariz. 273, 376 P.2d 134 (1962); West v. State, 24 Ariz. 237, 208 P. 412 (1922). See also People v. Bean, 88 Cal.App.2d 34, 198 P.2d 379 (1948); Webster v. State, 96 Okl.Cr. 44, 248 P.2d 646 (1952)." State v. Reynolds, 9 Ariz.App. 131, 133, 449 P.2d 968, 970 (1969).

We find no error.

## WAS THE DEFENDANT CLAYTON FORCED TO TESTIFY?

After the State had rested both the defendants, Clayton and Penrod, also rested their cases, neither defendant presenting any testimony. After this there was a discussion in chambers (not reported) which led the defendant to believe that the court would refuse to give any instruction on self-defense or manslaughter. Mr. Clayton's attorney had previously notified the court that his client, Clayton, had indicated to the court that he did not wish to take the stand. After a motion by Clayton's attorney to reopen, the following transpired:

"THE COURT: Inasmuch as the matter of a decision by your client, Mr. Clayton, not to testify despite the advice of counsel to the contrary is concerned, I feel the Court should inquire, Mr. Clayton, into the question of whether or not it is your present desire as counsel has indicated, or if you approve of the action of counsel in moving to reopen the case for the purpose of permitting you to testify on your own behalf.

"DEFENDANT CLAYTON: It is, Your Honor.

"THE COURT: And is this decision on your part freely and voluntarily made?

"DEFENDANT CLAYTON: Yes, Your Honor.

"THE COURT: And have you in any way been forced or threatened in any way to compel you to agree to testifying on your own behalf?

"DEFENDANT CLAYTON: The circumstances have compelled me to testify in my own behalf.

"THE COURT: What do you mean by that?

"MR. ALVAREZ: Explain to him.

"DEFENDANT CLAYTON: Well, the fact that evidently it is not in your mind to give self-defense instructions to the jury and I feel with my testimony you may reconsider that.

"THE COURT: Then you feel that you are under some compulsion to testify as a result of what Mr. Alvarez has told you?

"DEFENDANT CLAYTON: Yes, I do.

"THE COURT: And what did Mr. Alvarez tell you about this, to compel you to make you feel that you are compelled to testify?

"DEFENDANT CLAYTON: He told me that at the present you aren't planning on entering the rules on self-defense and the jury don't have a whole lot of choice about the verdicts they bring back except they can bring back guilty or not guilty on murder one and guilty or not guilty on burglary, the way things stand now.

"THE COURT: Well, what makes you think that the fact that the Court might not consider the submission of the question of self-defense to the jury as being such a matter that you are compelled to testify?

"DEFENDANT CLAYTON: I feel my testimony would prove self-defense."

After the defendant Clayton testified the court did agree to give an instruction on self-defense.

■ It may well be that the defendant Clayton's decision to testify was based upon the expected refusal of the trial court to give an instruction for self-defense. This is merely a question of trial strategy on the defendant's part. If he wants the instruction or any other instruction not supported by the evidence presented up to that time, he or someone on behalf of the defendant is going to have to testify. Defendant may feel he was "coerced" into testifying and, in a sense he was, in that he was well-advised to do so if he wanted to present evidence upon which to base a request for an instruction on self-defense, but it is not coercion in the sense that it was illegal or error.

## WAS THERE CORROBORATION TO SUPPORT THE CONVICTION OF PENROD?

It is the contention of the defendant Penrod that there was no corroboration or other evidence which tended to independently link Penrod with the commission of the crime. Our statute states:

"A conviction shall not be had on the testimony of an accomplice unless the accomplice is corroborated by other evidence which, in itself and without aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." § 13–136 A.R.S.

■ In the instant case the testimony of the codefendant or accomplice Evans, clearly implicated Penrod and Clayton. A reading of the transcript indicates that in addition to the testimony of Evans, a bag containing tools and a crowbar was found in the automobile parked near the restaurant, that in the automobile were equipment repair orders made out to Penrod and Clayton, plus a permit to enter on the Ft. Huachuca Military Reservation made out to Herbert Penrod. The testimony of the sheriff indicated that three sets of tracks led from the backdoor of the restaurant, the deputies followed these tracks and Penrod and Evans were then apprehended to-

gether some 15 miles from the scene as a result of this tracking. We believe this is sufficient corroboration of the accomplice's testimony.

We have stated concerning § 13–136 A.R.S.:

" . . . Our case law interpreting this statute provides, among other things, that evidence which in only a 'slight' degree tends to implicate the defendant is sufficient to corroborate an accomplice's testimony, State v. Miller, 71 Ariz. 140, 224 P.2d 205; that the corroborating evidence need not be sufficient to establish the defendant's guilt, State v. Goldthorpe, 96 Ariz. 350, 395 P.2d 708; that the evidence need not directly connect the defendant with the offense but need only tend to do so, State v. Sheldon, 91 Ariz. 73, 369 P.2d 917; that the necessary corroboration may be established by circumstantial evidence, State v. Bagby, 83 Ariz. 83, 316 P.2d 941; and that, '[i]n the last analysis . . . the facts of each case must govern.' State v. Sheldon, supra, 91 Ariz. at p. 79, 369 P.2d at p. 922." State v. Springer, 102 Ariz. 238, 240, 428 P.2d 95, 97 (1967).

## SEPARATE TRIAL

Finally, the defendant Penrod contends it was reversible error to deny his timely motion for separate trial even though the two defendants were represented by different counsel.

Defendant Penrod contends that he was prejudiced by the introduction into evidence of a handwritten note by the defendant Clayton exhorting the defendant Evans not to testify against the defendants Clayton and Penrod. This note was admitted by the court with the instruction that it was applicable only to the defendant Clayton and was not to be considered against the defendant Penrod.

The defendant further contends that the fact that Clayton felt that he had to take the stand to testify prejudiced him because he, Penrod, did not take the stand.

We disagree. Rule 254, Arizona Rules of Criminal Procedure, 17 A.R.S., gives the trial judge discretion in granting or refusing a request for separate trial and will not be reversed unless a clear abuse of discretion is shown, State v. Webb, 101 Ariz. 307, 419 P.2d 91 (1966), and whether there is an abuse of discretion in the denial of severance must be based on the showing at the time the motion is made and not what ultimately transpires at the trial. State v. Goodyear, 100 Ariz. 244, 413 P.2d 566 (1966). There is no indication that the defendant Penrod was limited in his right to cross-examine the codefendant Evans; neither was there any limitation on the part of Penrod to cross-examine Clayton when Clayton took the stand and the attorney for Penrod did in fact cross-examine Clayton concerning the note from Clayton to Evans. The fact that the codefendant Clayton took the stand and Penrod did not may have been detrimental to Penrod. The trial judge specifically instructed the jury of Penrod's right not to take the stand and that this was not to be used against Penrod. We find no error.

## DEATH PENALTY

We have not, in this opinion, discussed issues involving the death penalty. Furman v. Georgia, supra, and Stewart v. Massachusetts, supra. In accordance with our announced policy in this regard, the death penalties are set aside and reduced to life imprisonment. State v. Taylor, 109 Ariz. 267, 508 P.2d 731 (1973); State v. Chatman, 109 Ariz. 275, 508 P.2d 739 (1973); § 13–1717(B) A.R.S.

Judgments affirmed.

HAYS, C. J., STRUCKMEYER, and HOLOHAN, JJ., and MARY ANNE RICHEY, Superior Court Judge, Pima County, concur.

LORNA E. LOCKWOOD, J., did not participate in the determination of this matter.