698 P.2d 183

**STATE of Arizona, Appellee,**

v.

**Patrick Gene POLAND, Appellant.**

No. 4970–2.

Supreme Court of Arizona,
In Banc.

March 20, 1985.

Robert K. Corbin, Atty. Gen. by Gerald R. Grant, Asst. Atty. Gen., Phoenix, for appellee.

Marc. E. Hammond, Prescott, for appellant.

CAMERON, Justice.

In *State v. Poland*, 132 Ariz. 269, 645 P.2d 784 (1982) (*Poland I*), we reversed defendant Patrick Poland's convictions for two counts of first degree murder with sentences of death and remanded for a new trial. Upon remand, defendant was retried before a jury and again found guilty of two counts of first degree murder in violation of A.R.S. § 13–1105(A)(1). He was again sentenced to death. A.R.S. § 13–703. We have jurisdiction pursuant to Art. 6, § 5(3) of the Arizona Constitution, and A.R.S. §§ 13–4031 and 13–4035.

Defendant raises the following questions on appeal:

1. Pretrial Issues:
 (a) Was defendant improperly denied:
 (i) a peremptory change of the trial judge?
 (ii) a change of judge for cause?
 (b) Did the trial court improperly refuse to strike two jurors for cause?
 (c) Did the trial court improperly refuse to allow testimony by an expert on eyewitness identification?
 (d) Did the trial court err in refusing to suppress physical evidence obtained as the result of an alleged illegal search and insufficient search warrant?

2. Trial Issues:
 (a) Did the trial court err in admitting into evidence defendant's prior conviction for bank robbery?
 (b) Was the prior testimony of hypnotized witness, Stanley Sekulski, improperly read to the jury?
 (c) Did the trial court commit reversible error by admitting a gruesome photograph into evidence?
 (d) In light of our prior ruling in Poland I, supra, that a taser gun was improperly admitted into evidence, did the trial court improperly admit a receipt showing that weapon's purchase, the box for the weapon, and testimony thereon?
 (e) Did the trial court err in failing to grant a mistrial when the prosecution introduced a previously undisclosed statement of defendant?
 (f) Did the trial court err in failing to define "intent" as part of its jury instruction on aiding and abetting?

3. Death Penalty Issues:
 (a) Is A.R.S. § 13–703, the death penalty statute, constitutional?
 (b) Did reimposition of the death penalty constitute double jeopardy?
 (c) Were the aggravating circumstances found in this case proven beyond a reasonable doubt?
 (d) Did the trial court improperly refuse to consider certain mitigating factors offered by defendant?
 (e) Is defendant's sentence proportional to sentences imposed in similar cases in Arizona?

The facts necessary for a determination of this matter on appeal are as follows:[1]

At approximately 8 A.M. on 24 May 1977, a Purolator van containing some $328,180 in cash left Phoenix on a routine delivery to banks in various towns in northern Arizona. When the van failed to make its deliveries, the authorities were notified. The abandoned van with some $35,150 in cash was discovered early the next day a short distance off Highway I–17.

The evidence revealed that on the morning of 24 May 1977, a number of passing motorists had noticed a Purolator van pulled over to the side of Highway I–17 by what appeared to be a police car. Some witnesses identified the two uniformed men as Michael and Patrick Poland. The evidence also showed that on 24 May 1977, Michael and Patrick Poland borrowed a pickup truck and tarpaulin from their father, George Poland. Early on 25 May 1977, Michael Poland rented a boat at the Temple Bar Marina on Lake Mead. He stated that he planned to meet his brother Patrick at Bonelli Landing, a primitive camping area on the Lake, and to do some fishing. At some point, George Poland's truck became stuck in the sand at the water's edge at Bonelli Landing with the tailgate facing the water. After their attempts to extricate it had failed, the Polands called a towing service. Stan Sekulski was the operator of the tow truck. A few days later, the Polands returned their father's truck with a new tarp, explaining the old one had been ruined when they placed it under the wheels of the truck for traction.

Three weeks later, the body of Cecil Newkirk, one of the guards of the Purolator van, surfaced on Debbie's Cove, a small inlet on the Nevada side of Lake Mead. The body was partially covered by a canvas bag. A week later, park rangers searching the area discovered the body of the other Purolator guard, Russell Dempsey, a short distance from the place Cecil Newkirk's body had been found. Autopsies revealed that the most probable cause of death was drowning, although in the case of Mr.

Dempsey the pathologist was unable to rule out a heart attack as a possible cause of death. The bodies had been in the water two weeks or longer. There was no evidence that the guards had been wounded or tied before being placed in the water. Although it was impossible to determine whether they had been drugged, there was no evidence of a struggle. Divers searching the area recovered two other canvas bags, one containing a tarp and blanket. They also brought up two revolvers, which were identified as belonging to the guards, and a license plate bearing the insignia found on Arizona Department of Public Safety automobiles. These were found near a pile of rocks which had evidently fallen out of the bag when it was recovered by a diver. The rocks were of the type found along the shore of Debbie's Cove.

Searches of the homes of Michael and Patrick Poland on 27 July 1977 revealed a number of weapons, including a taser gun, large amounts of cash, and items of police-type paraphernalia. Of particular interest were a scanner and scanner key which were capable of monitoring radio frequencies, a notebook listing local police frequencies, a receipt for a taser gun bearing the name Mark Harris, handcuff cases, and a gunbelt. Both of the Polands' rented cars, light-colored Chevrolet Malibus, had siren-type burglar alarms which could be activated from inside or outside of the car. Evidence also connected the Polands to the purchase of a "light bar" or rack which could be placed on top of an automobile and would resemble a law enforcement light bar or rack. The canvas bags found in the lake were shown to have been purchased by a Mark Harris.

Although neither Michael nor Patrick Poland had regular employment, the evidence showed that they made numerous large purchases during June and July of 1977. These purchases included appliances, furniture, motorcycles, and a business. Most of the purchases were made in cash or by a cashier's check.

---

**1.** These facts are identical to the statement of facts in *Poland I,* supra.

The defense was alibi. Patrick took the stand and testified that both he and his brother had disguised themselves as law enforcement officers and robbed drug dealers on three occasions in early 1977. They testified that they had also been dealing in gems for several months prior to the Purolator incident and that, on 24 May 1977, they had taken a load of raw turquoise to Las Vegas and returned by way of Lake Mead to do some camping.

Michael and Patrick Poland were convicted. They appealed and we reversed and remanded based upon jury misconduct. *See Poland I,* supra. On remand, defendants were again convicted and sentenced to death. We consider the appeal of Patrick Poland.

## PRETRIAL ISSUES

### a. Change of Judge

The mandate in *Poland I* was filed in this Court and mailed to the Yavapai County Superior Court on 26 May 1982. On 8 June the county attorney moved to dismiss the case. The motion to dismiss was not heard until 21 June, at which time it was denied. On 19 July, special deputies were appointed to prosecute and defendant filed motions for change of judge pursuant to Rule 10.2, Arizona Rules of Criminal Procedure, 17 A.R.S., and to disqualify the judge for cause pursuant to Rule 10.1, Arizona Rules of Criminal Procedure, 17 A.R.S. These motions were heard and denied by another judge. The peremptory challenge motion was denied because it was untimely, and the change of judge for cause motion was denied because bias or prejudice was not shown.

### i. Peremptory Change of Judge

We first consider defendant's contention that the trial court committed reversible error in denying his peremptory motion for a change of judge. Our rule regarding change of judge upon request states:

a. Entitlement. In any criminal case in Superior Court, any party shall be entitled to request a change of judge.

\* \* \* \* \* \*

c. Time for Filing. A notice of change of judge shall be filed, or informal request made, within 10 days after any of the following:

\* \* \* \* \* \*

(2) Filing of the mandate from an Appellate Court with the clerk of the Superior Court;

Rule 10.2(a), (c)(2), Arizona Rules of Criminal Procedure, 17 A.R.S.

Our *Poland I* mandate was filed and mailed on 26 May 1982. The parties agree that defendant had 15 days, (10 days pursuant to Rule 10.2, supra, and 5 days for mailing pursuant to Rule 1.3, Arizona Rules of Criminal Procedure, 17 A.R.S.) to move to disqualify the judge without cause. The motion was not made until 19 July, some 54 days after the issuance of the mandate. This was too late and the motion was properly denied as untimely.

Defendant contends, however, that strict compliance with the rule should be waived because he relied upon the State's 8 June motion to dismiss and, therefore, did not believe that he would go to trial. Had the motion to dismiss been granted, a motion for change of judge would have been unnecessary.

■ Admittedly, strict compliance with a rule like ours can be waived where the peremptory challenge is made diligently and as soon as practicable. *Smith v. State,* 616 P.2d 863, 865 (Alaska 1980) ("Insofar as each challenge was made almost immediately after the parties learned of the judicial assignment for trial, it cannot be said that their rights to challenge were waived through untimeliness."), *Riley v. State,* 608 P.2d 27 (Alaska 1980) (strict compliance was waived where counsel exercised the challenge promptly upon being appointed). In the instant case, however, defendant did not act diligently to protect his peremptory challenge rights. The motion to dismiss did not extend the time for

filing the motion for change of judge. We find no reason to waive the time limits of the rule.

■ Furthermore, by participating in these hearings, defendant waived his peremptory challenge rights pursuant to Rule 10.4(a), Arizona Rules of Criminal Procedure, 17 A.R.S., which provides in pertinent part that "[a] party loses his right under Rule 10.2 to a change of judge when he participates before that judge in any contested matter in the case, [or] * * * any pretrial hearing * * *." In other words, if a party participates in a hearing which involves a contested issue of law or fact, the right to a peremptory challenge of the judge is waived. *Itasca State Bank v. Superior Court*, 8 Ariz.App. 279, 445 P.2d 555 (1968). The hearings in this case involved contested issues insofar as the parties disagreed on the important question of whether the requested dismissal would be with or without prejudice. This case can then be distinguished from *City of Sierra Vista v. Cochise Enterprises, Inc.*, 128 Ariz. 467, 626 P.2d 1099 (App.1979), in which it was held that a hearing on a stipulated, and therefore uncontested, motion to dismiss with prejudice did not result in a waiver.

### ii. Change of Judge for Cause

Defendant next maintains that he was denied a fair trial because the judge who sentenced him to death in *Poland I*, supra, presided over his retrial. He argues that his motion for change of judge for cause, therefore, should have been granted, or alternatively, that it was error for the trial judge not to have recused himself. We do not agree for two reasons.

■ First, the motion was not timely. Rule 10.1(b), Arizona Rules of Criminal Procedure, 17 A.R.S., states:

Within 10 days after discovery that grounds exist for change of judge, but not after commencement of a hearing or trial, a party may file a motion verified by affidavit of the moving party and alleging specifically the grounds for the change.

The ground for the change was the judge's participation in the prior trial. This was known at the time of remand. Admittedly, defendant may not have known the judge was to retry the case at that time. The defendant was aware, however, of the judge's participation by the time of the first hearing on the motion to dismiss on 21 June. Defendant's motion for change of judge filed 19 July came too late.

■ Second, even assuming the timeliness of the motion to disqualify, its denial was still correct. Defendant relied upon *State v. Vickers*, which states:

We have held that even though the judge had prior knowledge of defendant's past bad acts, he need not disqualify himself, so long as the facts are those which would ordinarily be found in a presentence report and the defendant knew the factual basis upon which the judge imposed the sentence. In a death penalty case, however, which is treated differently from non-death penalty cases, we believe that there is an appearance of impropriety when a judge who has sentenced the defendant to death in a prior case, also tries the same defendant for another potential death penalty offense. The judge should have recused himself from trying this defendant for the second murder.

138 Ariz. 450, 452, 675 P.2d 710, 712 (1983). (Citations omitted.) In *Vickers*, however, the judge had sentenced the same defendant to death in a prior but different murder case. Unlike the case before us, which involves the same crimes on retrial, *Vickers* involved death sentences for two distinct crimes. We did not believe that the judge in *Vickers* would be able to put aside the bias that he would have because of knowledge of the facts of the other crime. In the retrial of the same crime by the same judge, however, there is only the repetition of the same facts—the same facts that would be heard by any judge who tries the case. Under these circumstances, it can not be said that the prior

trial prejudiced the judge the second time around. We find no error.

b. Refusal to Strike Jurors

Defendant argues that the court erred in refusing to strike two jurors for cause.

John Matthews testified on voir dire that he had heard and read about the case from T.V., radio, and newspapers. He answered the court's questions as follows:

BY THE COURT:

Q Do you remember any of the specifics of any of the accounts that you have seen on television or heard on or about radio?

\* \* \* \* \* \*

A. Well, just that they were going to retry them, have a retrial.

Q. So you are aware this is a retrial?

A. Yes, right.

Q. Now going back to the earlier accounts that you had seen and as you followed through the case, in that period of time did you form any opinion of your own concerning the guilt or the innocence of the Defendants?

A I would say so.

\* \* \* \* \* \*

Q Do you understand if you were picked as a juror in this case it would be necessary for you to decide this case only on the evidence and the testimony presented here in the courtroom?

A Yes.

Q And that you would have to put from your mind anything that you had seen or heard or read or knew about the case in any form whatsoever?

A Yes.

Q Do you understand that?

A Yes.

Q Do you feel you could do that?

A I probably could.

Q Do you feel you could fairly and impartially judge this case solely on what was presented to you here in this courtroom in this trial?

A Probably could.

Q And that you could, when you went to the jury room, if you were a member of the jury, not discuss anything that took place prior or permit anyone else to talk to you about anything that took place prior?

A Probably could.

Q You could do that?

A Probably.

In response to the prosecutor's question, the juror testified that he would be able to vote not guilty if the State failed in the burden of proof.

In response to the question of defendant's counsel:

Q Haven't you told the Judge that you previously formed an opinion that Michael and Patrick Poland were guilty based on what you had read and seen about the case?

\* \* \* \* \* \*

A He was found guilty in the first case.

Q Right. And is the fact that they were found guilty in the first case, is that going to somehow influence your decision if you sit as a juror in this case?

A No.

Q You can totally wipe that out of your mind?

A Well, as far as I know.

\* \* \* \* \* \*

Q Do you realize, Mr. Matthews, that anyone who is charged with a crime is presumed innocent by the law until proven guilty beyond a reasonable doubt?

A Yes, sir.

\* \* \* \* \* \*

Q Let me ask you one more question: as you sit here today and you look at these Defendants, knowing what you know about the case, knowing about the prior proceedings, do you have any feeling in your mind that these men are guilty?

A No.

The other juror objected to by defendant, Cynthia Dea Benavidez, testified as follows:

BY THE COURT:

Q Mrs. Benavidez, you indicated you had seen or heard or read or know something about this case, is that right?

A Yeah, I have seen on T.V. news and stuff.

Q Okay. You have seen it on T.V.

* * * * * *

A Yes.

Q And when would that have been, ma'am?

A Oh, I don't know the exact time. Just when the trials come up and, you know, what you see on T.V. news.

* * * * * *

Q Okay. Do you realize if you were selected as a member of this jury you would have to decide guilt or innocence based only on what was presented here in this courtroom?

A Yes, that's what I know.

Q And do you think you could do that?

A No.

Q You don't think you could put all the things you have seen out of your mind and decide this case only on the evidence and testimony presented here in the courtroom?

A Well, maybe I could, because I really haven't followed that close, but I just—

Q I know it's a tough question.

A But just from what I know I thought they were guilty.

* * * * * *

Q I know this is tough. We have to look into your mind.

A I think I have already formed an opinion, but I—I don't know that much about Court and stuff, you know.

Q Well, in a Court you would have an opening statement presented by both sides in the action, you would have witnesses who would be placed under oath and take the stand and sit where you are sitting, they would be asked questions. After all the evidence and testimony had been presented, then the lawyers would argue the case and the evidence as they saw it, and then I would instruct you on the law that governs this case and it would be your duty to follow that law, and then and only then would you go into the jury room with the other jurors and decide the case. Do you think you could do that or do you think you could not?

A I think I could.

The prosecutor and attorneys for defendant also questioned Cynthia Dea Benavidez as follows:

BY THE PROSECUTOR

Q Would you be able to fairly and impartially judge the case so that at the end of the case if the State had proved the Defendants guilty beyond a reasonable doubt you could find them guilty, and if the State has failed in its burden you would find them not guilty? Could you do that?

A Sure, if I sit and listen to it all I'm sure my mind could still be open.

Q Okay. Could you—do you think you would have the ability, and I am sure having watched television, that occasionally people—memories will come back, programs you saw something on television that a witness is talking about now. Would you be able to set aside that which you saw on television and judge each witness and their performance and their testimony and their evidence and base your decision only on that evidence and nothing else?

A Yes, I could, because I don't really remember that much about it.

* * * * * *

BY DEFENDANT'S ATTORNEY

Q All right. And you do understand that Michael and Patrick Poland have the right to a fair trial?

A Yes I understand. I know the system. I'm thankful for that.

Q Right. And that if the State hadn't proved its burden, then all that you had heard, all that you had read, could not be used to otherwise convict them. Do you understand that?

A Yes.

* * * * * *

Q If you were charged with murder, ma'am, would you feel comfortable hav-

**398**

ing someone with your frame of mind and knowing what you know sitting on the jury and judge you?

A No.

Q You think what you know is going to influence, even subconsciously, your verdict in this case?

A I don't—well, like—um—if I had to sit and listen to everything, you know, then make an opinion, it might be different.

Q But right now if you were being tried for murder you wouldn't want someone with your frame of mind judging you?

A Well not from what I have already saw.

Q That's what I mean.

A No.

 \* \* \* \* \* \*

BY THE COURT:

Q The bottom line, Mrs. Benavidez, has to be whether or not you feel if you were on the jury you could judge this case solely on the evidence and testimony presented here in the courtroom and on that basis render a verdict?

A I think I could do that.

■ We have held that because a juror has preconceived notions or opinions does not necessarily render him incompetent to fairly and impartially decide a case. *State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54, 63 (1984); *State v. Tison*, 129 Ariz. 526, 533, 633 P.2d 335, 342 (1981), cert. denied, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). If a juror is willing to put aside his opinions and base his decision solely upon the evidence, he may serve. *See Clabourne*, supra; *State v. Greenawalt*, 128 Ariz. 388, 394, 626 P.2d 118, 124, cert. denied, 454 U.S. 848, 102 S.Ct. 167, 70 L.Ed.2d 136 (1981). The voir dire may be used for the purpose of rehabilitating a juror by convincing him of his responsibility to sit impartially. *Clabourne*, supra; *State v. Clayton*, 109 Ariz. 587, 593, 514 P.2d 720, 727 (1973).

■ We will not set aside a ruling upon a challenge to a juror absent a clear showing that the trial court abused its dis-

cretion. *State v. Montano*, 136 Ariz. 605, 607, 667 P.2d 1320, 1322 (1983). Because the record shows the contested jurors were adequately rehabilitated through the voir dire, the trial court did not abuse its discretion in failing to strike them. We find no error.

c. Expert Eyewitness Identification Testimony

Prior to trial, the State moved to suppress expert testimony regarding eyewitness identification. The trial court granted the motion. Defendant argues that the trial court abused its discretion in not allowing the presentation of expert testimony on eyewitness identification. We do not agree.

■ The test for preclusion of expert testimony "is whether the subject of inquiry is one of such common knowledge that people of ordinary education could reach a conclusion as intelligently as the witness \* \* \*." *State v. Owens*, 112 Ariz. 223, 227, 540 P.2d 695, 699 (1975). Expert testimony on eyewitness identification is usually precluded because it invades the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony. It is usually not a proper subject for expert testimony.

■ We have, however, previously sanctioned the use of expert testimony on eyewitness identification:

The admissibility of expert testimony is governed by Rule 702, Ariz.R. of Evid. That rule states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In what is probably the leading case on the subject, the Ninth Circuit affirmed the trial court's preclusion of expert evidence on eyewitness identification in *United States v. Amaral*, 488 F.2d 1148

(9th Cir.1973). In its analysis, however, the court set out, four criteria which should be applied in order to determine the admissibility of such testimony. These are: (1) qualified expert; (2) proper subject; (3) conformity to a generally accepted explanatory theory; and (4) probative value compared to prejudicial effect. *Id.* at 1153. We approve this test and find that the case at bar meets these criteria.

We recognize that the cases that have considered the subject have uniformly affirmed trial court rulings denying admission of this type of testimony. However, a careful reading of these cases reveals that many of them contain fact situations which fail to meet the Amaral criteria or are decided on legal principles which differ from those we follow in Arizona. *State v. Chapple,* 135 Ariz. 281, 291, 660 P.2d 1208 (1983). Our holding in *Chapple* was limited to the peculiar facts of that case. As we noted, "[n]o direct or circumstantial evidence of any kind connect[ed] defendant to the crime, other than the testimony of [the eyewitnesses] * * *." *Id.* at 285, 660 P.2d at 1212 (footnote omitted). We specifically stated, however, that "The rule in Arizona will continue to be that in the usual case we will support the trial court's discretionary ruling on admissibility of expert testimony on eyewitness identification." *Id.* at 297, 660 P.2d at 1224. *See also People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984) (adopting the rule of limited usage outlined in *Chapple* ); Note, *Expert Testimony on Eyewitness Identification: Invading the Province of the Jury?,* 26 Ariz.L.Rev. 399 (1984) (cautioning against the widespread use of such testimony). Under the facts of this case, the trial court did not abuse its discretion in refusing to allow the introduction of expert testimony on eyewitness identification. The peculiar facts of Chapple were not present in the instant case. The question of guilt did not hinge solely on the testimony of eyewitnesses. There was nothing that the witness would testify to that was not within the common experience of the jurors. *State v. Owens,* supra,

112 Ariz. at 227, 540 P.2d at 699. The probative value of the testimony did not overcome the prejudicial effect. *Chapple,* supra. We find no error.

### d. Suppression of Material Evidence

During the investigation of the crimes, an FBI agent learned that the home Michael Poland had been renting was for sale. Posing as a buyer, the agent went through the house and later testified as to what he saw. Defendant claims this was an illegal entry. Defendant also questions the sufficiency of an affidavit in support of a search warrant.

We considered the same issues based upon the same facts in the prior case, *Poland I,* 132 Ariz. at 277–78, 645 P.2d at 792–93. We found no error then and we find no error now.

## TRIAL ISSUES

### a. Prior Conviction

Defendant contends that the trial court abused its discretion by allowing defendant to be impeached with a prior felony conviction for bank robbery.

Our Rules of Evidence state in pertinent part:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record, if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, and if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted or (2) involved dishonesty or false statement, regardless of the punishment.

Rule 609(a), Arizona Rules of Evidence, 17A A.R.S. Defendant does not assert that his prior conviction is not governed by this rule or that it was too remote in time to be used. Rather, he claims that the trial court did not make the requisite finding that the probative value of using the prior convic-

tion for impeachment purposes outweighed any prejudicial effect.

In making the motion to preclude the use of the prior conviction, defendant's attorney stated:

Our motion is based on Rule 609 of the Arizona Rules of Evidence. The primary thrust of our motion is that the *potential for prejudice in introducing this prior conviction will outweigh any probative value it might have for impeachment purposes.* The main fear that I have is that the jury will utilize this conviction as substantive evidence of guilt rather than utilizing it for the limited purpose of deciding the truthfulness or non-truthfulness of any testimony that the witness offers. (Emphasis ours.)

After argument on the motion, the court took the matter under advisement and then ruled as follows:

The rulings I'm prepared to make are that the Defendants' motion to preclude the use of the prior conviction is denied.

I have spent a good deal of time reviewing this motion and the arguments and the opposition to it. I believe that, under the rules, that the use of that prior conviction can be used to impeach the Defendant if the Defendant elects to testify.

 We agree that the preferred method for complying with Rule 609 is a specific on-the-record finding that the probative value of using a prior conviction for impeachment outweighs the danger of unfair prejudice. *State v. Hunter,* 137 Ariz. 234, 237, 669 P.2d 1011, 1014 (App.1983); *State v. Dixon,* 127 Ariz. 554, 558, 622 P.2d 501, 505 (App.1980). Where, however, it is clear from a reading of the record that the probative value has been balanced against the prejudice, a specific finding need not be made. *See State v. Ellerson,* 125 Ariz. 249, 252, 609 P.2d 64, 67 (1980). It appears that the trial judge in the instant case did balance the probative value against the potential prejudicial effect. The decision whether to admit evidence of the prior conviction for impeachment purposes was within the sound discretion of the trial

court. *State v. McElyea,* 130 Ariz. 185, 188, 635 P.2d 170, 173 (1981). We find no abuse of that discretion. *Id.*

Neither do we believe that the trial judge ruled incorrectly. Because defendant relied upon an alibi defense, impeachment evidence was vitally important to the State. The significance of such evidence in similar situations has been recognized. *See State v. Gillies,* 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983). We find no error.

**b. Hypnotized Witness**

Stanley Sekulski, the tow truck operator who pulled the truck out of the sand at Bonelli Landing, was a potential witness against the defendant. He had been hypnotized prior to trial. For other reasons, he was found incompetent to testify. Instead the testimony he gave at defendant's first trial was read to the jury. This testimony was first edited, however, to reflect solely the recall he had prior to his being hypnotized during the investigative phase of the case. This was done by using the pre-hypnotic statements made to the police and the FBI. The cross-examination was, however, read in its entirety. Defendant maintains, nevertheless, that this procedure deprived him of the right to confront and cross-examine a witness against him, U.S. Const. amend. VI; amend. XIV. We do not agree.

First, we note that the use of former testimony is a recognized exception to the rule against hearsay whenever a witness is declared incompetent to testify or is otherwise unavailable. Rule 804(b)(1), Arizona Rules of Evidence, 17A A.R.S. In the instant case, it was agreed that the witness was in fact incompetent to testify.

 Second, although a witness is rendered incompetent to testify as to the recall induced through hypnosis, he may testify to facts demonstrably recalled prior to hypnosis:

We further minimize the risk [of using the testimony of a hypnotized witness] by requiring that before hypnotizing a potential witness for investigatory pur-

poses, the party intending to offer the prehypnotic recall appropriately record in written, tape recorded or, preferably, videotaped form the substance of the witness' knowledge and recollection about the evidence in question so that the prehypnotic recall may be established. Such recordation must be preserved so that at trial the testimony of that witness can be limited to the prehypnotic recall. If such steps are not taken, admission of the prehypnotic recall will be error, which, if prejudicial, will require reversal.

*State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 210, 644 P.2d 1266, 1296 (1982). In the instant case, the trial court ruled that FBI 302 reports and Las Vegas Police Department reports met the recordation requirement. Such reports are regularly used to summarize witness interviews, and in this case, they were used to edit Sekulski's former testimony to reflect only his prehypnotic recall.

■ We imposed the requirement of a prehypnotic record to mitigate the danger of subsequent hypnosis contaminating testimony of facts recalled prior to hypnosis. *Id.* Although we continue to adhere to the view expressed in Collins that videotaping is the preferred method for preserving prehypnotic recall, in the instant case, the FBI and police reports adequately enabled the parties to segregate the prehypnotic recall from post hypnotic testimony. From these reports, prepared prior to any hypnotic sessions, the transcript was edited to reflect only Sekulski's prehypnotic recall. The attendant risks were further minimized through the reading of Sekulski's cross-examination in its entirety. *Id.* Furthermore, had defendant elected, he could have introduced expert testimony to show that Sekulski's prehypnotic recall was tainted by his subsequent hypnosis. *Id.* Under these facts, the risks inherent in using the testimony of the previously hypnotized witness were minimized in accordance with our decision in *Collins.* We find no error.

### c. Gruesome Photographs

■ Defendant contends that the trial court abused its discretion in admitting two gruesome photographs into evidence. We will consider only one photograph, however, as we do not believe that the photograph of the fully clothed body of one of the victims lying face down near the area where it surfaced was gruesome.

■ The court found the second photograph to be gruesome and we agree. The photograph was a closeup of the torso and decomposed head of one of the victims. It shows him clad in his employer's uniform and a wristwatch. The photograph was, however, admitted because the court ruled that its probative value outweighed its prejudicial effect. Even though it was gruesome, a photograph may be admitted provided it has probative value apart from merely illustrating the atrociousness of the crime. *State v. Perea,* 142 Ariz. 352, 690 P.2d 71, 76 (1984). This is true notwithstanding the fact that neither the identity of the victim nor the manner of death are disputed. *Id.*

■ In the instant case, one of the victim's co-workers used the contested photograph to identify the victim by the type of uniform he was wearing. The medical examiner who performed the autopsies upon the victims testified that the photograph illustrated the difficulty he had in determining a cause of death because of decomposition. Furthermore, the photograph shows the victim with his watch on. Investigators hypothesized the time of death of the victims in reference to the time this watch stopped.

We do not believe the gruesomeness of the photograph outweighed its probative value. *State v. McCall,* 139 Ariz. 147, 157, 677 P.2d 920, 930 (1983); Rule 403, Arizona Rules of Evidence, 17A A.R.S. We find no error.

### d. Admission of Taser Gun Receipt and Gun Box

■ In *Poland I,* supra, we held that a taser gun was improperly admitted into evidence because it was never connected to the crime. We stated, however, that the

receipt for that weapon's purchase was properly seized and admitted at trial. *Id.* 132 Ariz. at 281, 645 P.2d at 796. We explained the receipt's relevance as follows: "[t]he taser gun receipt * * * indicated that it [the gun] had been purchased by an alias or accomplice, suggesting that it may have been purchased in contemplation of the crime or by another involved in the crime." *Id.* at 280, 645 P.2d at 795. We hold that evidence showing the use of such an alias was relevant and the receipt was properly admitted.

█ As to the empty taser gun box, we are unable to discern its relevance. Neither do we find its admission prejudicial. *See State v. Montes*, 136 Ariz. 491, 497, 667 P.2d 191, 197 (1983). We find no error.

### e. Mistrial

Defendant contends that the trial court erred in failing to grant his motion for a mistrial after the State adduced a previously undisclosed statement at trial.

Testimony was elicited at trial from prosecution witnesses that three men purchased the lightbar alleged to have been used in the commission of the crime. Because the State felt that the description of one of these men matched defendant's brother, Thad Scott Poland, he was interviewed on the evening prior to his scheduled testimony. Allegedly, he told investigators that defendant Patrick Poland revealed to him that he had purchased the lightbar. Without disclosing to defendant the nature of this witness's statements, the State presented the evidence at trial. Defendant did not object until after the witness had left the stand.

Rule 15.1(a)(1), Arizona Rules of Criminal Procedure, 17 A.R.S., provides that the State must make available to defendants relevant written or recorded statements of witnesses against them if it has such information within its control. Rule 15.6 reads:

If at any time after a disclosure has been made any party discovers additional information or material which would be subject to disclosure had it then been known, such party shall promptly notify all other parties of the existence of such additional material, and make an appropriate disclosure.

We find no error for two reasons.

█ First, the defendant failed to object until after the witness left the stand. It was not an abuse of discretion to fail to impose sanctions under such circumstances. *See State v. Gambrell*, 116 Ariz. 188, 190, 568 P.2d 1086, 1088 (App.1977).

█ Second, there was no prejudice to defendant by the alleged failure to disclose. It came as no surprise that defendant's brother would testify and there was opportunity to interrogate him regarding his proposed testimony. Furthermore, the witness discredited himself on the stand stating, "[w]ell, he [Patrick] never really said he bought the lightbar. That was my making that up basically. * * * Pat never said specifically that he'd ever bought a lightbar. That was me saying that." Any prejudice resulting from nondisclosure was further rectified during cross-examination. Under these circumstances, the error, if any, was non-prejudicial. *See State v. Jessen*, 130 Ariz. 1, 4, 633 P.2d 410, 414 (1981) (trial court did not abuse its discretion in failing to impose sanctions where no prejudice resulted from nondisclosure).

### f. Definition of Intent

The court instructed the jury as follows:

All persons concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission are principals in any crime so committed.

The defendants have produced evidence that they were not present at the time and place the alleged crime was committed. If you have a reasonable doubt whether the defendants were present at the time and place the alleged crime was committed you must find the defendants not guilty.

Defendants cite us to the language of the statute defining aiding and abetting,

A.R.S. § 13–301, which provides in pertinent part:

> "accomplice" means a person, * * *, who *with the intent to* promote or facilitate the commission of an offense:
>
> \* \* \* \* \* \*
>
> 2. Aids, counsels, agrees to aid or attempts to aid another person in planning or committing the offense.

(Emphasis added). They contend that the omission of the phrase "with the intent to" from the instruction given was error. We do not agree.

■ Lack of a particular instruction is not fatal where the instructions, read as a whole, adequately set forth the law. *State v. Villafuerte*, infra 142 Ariz. at 329, 690 P.2d at 48; *State v. Axley*, 132 Ariz. 383, 392, 646 P.2d 268, 277 (1982); *State v. Rhymes*, 129 Ariz. 56, 59, 628 P.2d 939, 942 (1981).

In the instant case, the jury was also instructed:

> The State must prove that the Defendants have done an act which is forbidden by law and that they *intended* to do it. You may determine that the Defendants *intended* to do the act if they did it voluntarily.
>
> \* \* \* \* \* \*
>
> A murder which is perpetrated by any kind of willful, deliberate and premeditated killing is murder of the first degree. All other kinds of murder are of the second degree. If you have a reasonable doubt about which of the two degrees of murder was committed, you must decide it was second degree murder.
>
> \* \* \* \* \* \*
>
> Malice aforethought may be express or implied. It is express when there is manifested a deliberate *intention* unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears or when the circumstances attending the killing show an abandon or malignant heart.

(Emphasis added).

■ The instruction, even though not mentioning the requisite element of intent, was sufficient when read in conjunction with an instruction that the defendant could not be found guilty in the absence of intent. *State v. George*, 95 Ariz. 366, 371, 390 P.2d 899, 904 (1964) (although element of "intent" omitted from instruction on aiding and abetting, no reversible error found where instructions, read as a whole, indicated that guilt could not be found absent the requisite intent). We believe that George is dispositive. We find no error.

## DEATH PENALTY ISSUES

### a. The Death Penalty Statute

■ Defendant contends that our death penalty statute, A.R.S. § 13–703, is unconstitutional. We have previously disposed of this question. *State v. Zaragoza*, 135 Ariz. 63, 68, 659 P.2d 22, 27, cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983); *State v. Clark*, 126 Ariz. 428, 435, 616 P.2d 888, 895, cert. denied, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). Furthermore, our sentencing scheme for capital cases is neither rendered unconstitutional because of its lack of jury participation, *State v. Roscoe*, 145 Ariz. 212, 226, 700 P.2d 1312, 1326 (1984), nor because of its failure to require beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances. *State v. Carriger*, 143 Ariz. 142, 159, 692 P.2d 991, 1008 (1984).

■ Additionally, we believe the death penalty was properly applied to the facts of this case. The record provides substantial support for the conclusion that defendant killed, attempted to kill, or intended to kill. *See Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *State v. Vickers*, 138 Ariz. 450, 452, 675 P.2d 710, 712 (1983). We find no error.

### b. Double Jeopardy

Defendant contends that the double jeopardy provisions of the United States and Arizona Constitutions barred reimposition

of the death penalty in this case. We do not agree.

■ The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides in pertinent part, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb * * *." Our state constitution contains a similar provision. Ariz. Const. Art. II, § 10. The United States Supreme Court has held that double jeopardy consequences attach to a sentencing proceeding whenever it resembles a trial. *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1980). The Court later stated, "respondent's initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding—whether death was the appropriate punishment for respondent's offense." *Arizona v. Rumsey,* — U.S. —, —, 104 S.Ct. 2305, 2310, 81 L.Ed.2d 164, 171 (1984).

■ Defendant contends that Bullington and Rumsey bar reimposition of the death penalty in the instant case. We do not agree. In those cases, the respective defendants were sentenced to terms of imprisonment. Upon remand, each was sentenced to death. The United States Supreme Court held that the Double Jeopardy Clause barred imposition of the death penalty in those cases. These holdings were based upon the fact that the respective state sentencing procedures resembled trials. Accordingly, because each defendant was initially sentenced to a term of imprisonment, he was impliedly "acquitted" of the death penalty.

In the instant case, defendant was sentenced to death at the end of his first trial. There was no implied "acquittal" of the death penalty. *Bullington* and *Rumsey* do not, therefore, apply. *See Knapp v. Cardwell,* 667 F.2d 1253, 1264–65 (9th Cir.), cert. denied, 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982).

Defendant argues, however, that he was impliedly "acquitted" of the death penalty at the appellate level because *Poland I,*

supra, overturned the single aggravating circumstance upon which his previous death sentence was based, that is that the murders were committed in an especially heinous, cruel or depraved manner, A.R.S. § 13–703(F)(6). Our holding in *Poland I,* however, was simply that the death penalty could not be based solely upon this aggravating circumstance because there was insufficient evidence to support it. This holding was not tantamount to a death penalty "acquittal."

Because we find below that the "heinous, cruel or depraved" aggravating circumstance was again not adequately proven, we need not reach the question of whether double jeopardy precluded the sentencing court from refinding this aggravating circumstance.

### c. Proof of Aggravating Circumstances

The trial court found as aggravating circumstances:

1. That defendant committed the crime in an "especially heinous, cruel or depraved manner." A.R.S. § 13–703(F)(6).

2. That the crime was committed "as consideration for the receipt, or in expectation of the receipt, or anything of pecuniary value." A.R.S. § 13–703(F)(5).

3. That defendant had been "previously convicted of a felony in the United States involving the use or threat of violence on another person." A.R.S. § 13–703(F)(2).

■ This court will, in all death cases, make an independent review of the facts to determine for itself the aggravating and mitigating factors. *State v. Smith,* 138 Ariz. 79, 85, 673 P.2d 17, 23 (1983), cert. denied, — U.S. —, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); *State v. Richmond,* 136 Ariz. 312, 317, 666 P.2d 57, 62, cert. denied, — U.S. —, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983).

Defendant contends that the sentencing court erred in its findings that the murders in this case were "especially heinous, cruel or depraved." A.R.S. § 13–703(F)(6). We agree.

In *Poland I,* supra 132 Ariz. at 285, 645 P.2d at 800, we set aside the finding of this aggravating circumstance (then contained in former A.R.S. § 13–454(E)(6), for the following reasons:

> In interpreting the aggravating circumstance that the offense was committed in an especially heinous, cruel, or depraved manner, we have stated:

> " * * * the cruelty referred to in the statute involved the pain and the mental and physical distress visited upon the victims. Heinous and depraved as used in the same statute meant the mental state and attitude of the perpetrator as reflected in his words and actions." *State v. Clark,* 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980), cert. denied 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612.

> We do not believe that the evidence so far produced in this case shows that the murders were cruel. We have interpreted "cruel" as "disposed to inflict pain esp. in a wanton, insensate or vindicative manner: sadistic." *State v. Lujan,* 124 Ariz. 365, 372, 604 P.2d 629, 636 (1979), quoting Webster's Third New International Dictionary. There was no evidence of suffering by the guards. The autopsy revealed no evidence that they had been bound or injured prior to being placed in the water, and there was no sign of a struggle. Cruelty has not been shown beyond a reasonable doubt. *State v. Lujan,* supra; *State v. Ortiz,* 131 Ariz. 195, 639 P.2d 1020 (1981); *State v. Bishop,* 127 Ariz. 531, 622 P.2d 478 (1980); *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

> Neither does the evidence support a finding that the murders were heinous or depraved. These terms were defined in *State v. Lujan,* supra:

> "heinous: hatefully or shockingly evil: grossly bad

> * * * * * *

> "depraved: marked by debasement, corruption, perversion or deteriora-

tion." 124 Ariz. at 372, 604 P.2d at 636.

The issue focuses on the state of mind of the killer. *State v. Lujan,* supra. The difficulty in making this determination in the case at bar is that there is very little evidence in the record of the exact circumstances of the guards' deaths. Although defendants' state of mind may be inferred from their behavior at or near the time of the offense, *State v. Lujan,* supra, we know nothing of the circumstances under which the guards were held hostage.

The State must prove the existence of aggravating circumstances beyond a reasonable doubt. *State v. Jordan,* 126 Ariz. 283, 614 P.2d 825, cert. denied, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). We do not believe it has been shown beyond a reasonable doubt that the murders were committed in an "especially heinous, cruel or depraved manner."

At retrial, the State again failed to show what we found lacking in *Poland I:* suffering by the victims and the circumstances surrounding their deaths. The State did not show the victims were conscious at the time of death. A finding of cruelty cannot stand where the State has failed to prove beyond a reasonable doubt that the victims were conscious at the time of death. *State v. Villafuerte,* 142 Ariz. 323, 690 P.2d 42, 50 (1984). We are, therefore, compelled to again set aside the finding that the murders were committed in an "especially heinous, cruel or depraved manner."

The State has, however, proven beyond a reasonable doubt that defendant "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–703(F)(5). This circumstance is applied to murders having a "financial motivation." *State v. Villafuerte,* supra at 328, 690 P.2d at 47; *State v. Graham,* 135 Ariz. 209, 212, 660 P.2d 460, 463 (1983); *State v. Clark,* 126 Ariz. 428, 436, 616 P.2d 888, 896, cert. denied, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). In the

instant case, the murders were part of an overall scheme to obtain items of pecuniary value. *State v. Nash*, 143 Ariz. 392, 405, 694 P.2d 222, 235 (1985). Under the facts of this case, the "pecuniary gain" finding was clearly warranted.

■■■■■ Defendant maintains, however, that the sentencing court incorrectly found the aggravating circumstance contained in A.R.S. § 13–703(F)(2): that he "was previously convicted of a felony in the United States involving the use or threat of violence on another person." He argues that this factor should not have been found absent an examination of whether violence played a role in his prior conviction for bank robbery. This argument was most recently raised and rejected in *State v. Nash*, at 404, 694 P.2d at 234, where we held that judicial notice may be taken that certain felonies, by definition, involve violence against others. *See also State v. Watson*, 120 Ariz. 441, 448, 586 P.2d 1253, 1260 (1978), cert. denied, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) ("Fear of force is an element of robbery and the conviction of robbery presumes that such fear was present.") Furthermore, defendant's claim that Double Jeopardy principles bar the use of his prior conviction to enhance sentencing is without merit. *State v. LeMaster*, 137 Ariz. 159, 166, 669 P.2d 592, 599 (App.1983).

d. Mitigating Circumstances

The trial court found as mitigating circumstances the defendant's close family ties, and that he was a model prisoner. The trial court found that these mitigating circumstances were not "sufficiently substantial to call for leniency." A.R.S. § 13–703(E).

Defendant raises two arguments relating to mitigating circumstances. First, he argues that the sentencing court's failure to find good reputation as a mitigating circumstance was error. We do not agree.

Defendant points to numerous letters written by family members and acquaintances attesting to his good reputation. The sentencing court, however, found this evidence was contradicted by defendant's prior conviction. The court reasoned that defendant's reputation was not a mitigating factor because it was falsely built.

■■■■■ Defendants have the burden of proving mitigating factors by a preponderance of the evidence. *State v. McMurtrey*, 143 Ariz. 71, 72–73, 691 P.2d 1099, 1100–1101 (1984). The sentencing court and this Court on appeal may take cognizance of evidence tending to refute a mitigating circumstance. *State v. Smith*, 131 Ariz. 29, 638 P.2d 696 (1981).

■■■ In light of conflicting evidence as to defendant's reputation, we do not believe that the defendant has shown by a preponderance of the evidence defendant's good reputation as a mitigating circumstance.

■■■ Second, defendant also claims error to the sentencing court's discussion of close family ties as a mitigating circumstance:

The Court does find the close family ties of the—that exist between the Defendants' families and their children as a mitigating circumstance. I don't want this to be misconstrued as an opinion of this Court that this in fact made them good husbands and fathers. On the contrary, the exact opposite would be true. It would be impossible to conceive of good husbands and fathers committing crimes of this nature, and thereby bearing the aura of being a good family man. I suspect the only possible self-justification that may be available to you both is that you somehow did this for your children and families, but of course quite the opposite is the result, and you have in fact destroyed your families, and I suspect that the best thing that you could do at this point would be to admit to them that you have committed these offenses, let them face up to it, let them try to prepare their lives in a manner that will permit them to exist in the future, otherwise you have destroyed them forever.

Defendant contends that the court was using a mitigating factor as an aggravat-

ing factor contrary to *State v. Just,* 138 Ariz. 534, 675 P.2d 1353 (App.1983) (where the sentencing court incorrectly used the defendant's prior exemplary life as an aggravating factor). We do not believe, however, that the court used defendant's close family ties in this manner. Rather, it appears that the court found this to be a mitigating factor but not "sufficiently substantial to call for leniency." *State v. Gretzler,* 135 Ariz. 42, 54, 659 P.2d 1, 13, cert. denied, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We find no error.

 We further find that neither defendant's age, twenty-seven at the time of the offenses, *State v. Clark,* supra; nor the fact that he was a model prisoner, *State v. Carriger,* 143 Ariz. 142, 161–162, 692 P.2d 991, 1010–1011 (1984), are mitigating factors sufficiently substantial to call for leniency. We believe the death penalty should be imposed in this case.

e. Proportionality

 We conduct a proportionality review as part of our independent review to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Villafuerte,* supra 142 Ariz. at 332, 690 P.2d at 51, *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976).

 Our review indicates that defendant's sentence is proportionate to sentences imposed by this state upon other defendants who have committed murders having a similar degree of aggravation. We have upheld the imposition of the death sentence in numerous cases involving two or more aggravating factors and no mitigating factors sufficiently substantial to call for leniency. *E.g., State v. Carriger,* supra; *State v. Fisher,* 141 Ariz. 227, 686 P.2d 750 (1984); *State v. Blazak,* 131 Ariz. 598, 643 P.2d 694 (1982). We have also upheld the death penalty where as here the crime is for the sole purpose of economic gain, *State v. Hensley,* 142 Ariz. 598, 691 P.2d 689 (1984).

The fact that defendant had a prior conviction involving the use or threat of violence and that the offense was for pecuniary gain together with insufficient mitigating circumstances brings this court to the conclusion that the crime is above the norm of first degree murders and that the defendant is above the norm of first degree murderers.

We have reviewed the entire record pursuant to A.R.S. § 13–4035 and have found no reversible error. The finding that the murders were committed in an "especially heinous, cruel or depraved manner" is set aside, but the findings as to the other aggravating circumstances are affirmed. No mitigating circumstances sufficiently substantial to call for leniency have been shown.

The judgments and sentences are affirmed.

HOLOHAN, C.J., and HAYS, J., concur.

GORDON, Vice Chief Justice (concurring in part, dissenting in part):

Regarding the disposition of defendant's peremptory change of judge claim, I concur in the result for different reasons than stated by the majority. I, however, dissent from affirming reimposition of the death sentence in this case.

We filed our mandate in *Poland I* on May 26, 1982. In the days immediately following this mandate the Yavapai County Attorney's office avowed to defendant's attorney that it would not retry the case. The County Attorney also made statements to the press expressing the same intentions. Defendant's attorney relied upon these private and public representations.

On June 8, 1982 the Yavapai County Attorney moved to dismiss the charges against defendant. On June 21, 1982, the trial court held a hearing on the prosecutor's motion where the prosecutor stated he was renewing his motion to dismiss. He argued that the state had lost contact with certain witnesses, others had died, still others were reluctant to testify, and that both defendants were serving 99 and 114 year

sentences in federal prison for convictions arising from the same facts. He also questioned the admissibility of the testimony of a previously hypnotized witness. The prosecutor also noted that the FBI agent in charge of the case agreed that chances for successful prosecution were "extremely poor." Both defense attorneys joined the prosecutor's motion and asked the Court to give due consideration to a dismissal with prejudice under the state of the evidence.

Unlike the majority I believe that until the June 21st hearing, defense counsel had no need to file a peremptory change of judge notice. The County Attorney never gave any indication that he would prosecute defendant. To the contrary, he insisted he would not, and defendant's counsel had every right to rely upon these assurances. Further, defense counsel had no way of knowing that the trial judge would deny the motion to dismiss. Defense counsel could reasonably conclude, in fact, that moving for a change of judge would be futile or even antagonistic in view of the appearance that the case would not again go to trial. I believe the majority's construction of Rule 10.2, Ariz.R.Crim.P., 17 A.R.S., is too harsh because it would require defense lawyers to file notice of peremptory change of judge even when a trial seems improbable.

In addition, I disagree that by participating in the state's motion to dismiss defendant waived his right to peremptorily challenge the judge. The majority claims this hearing involved a contested matter of law or fact in that the state wanted a dismissal without prejudice while defendant suggested a dismissal with prejudice. By participating in a contested matter in front of the trial judge, defendant would waive his right to peremptorily challenge the judge. Rule 10.4(a), Ariz.R.Crim.P., 17 A.R.S.

The majority has taken a strained view of the record. My reading of the record reveals that the defendant had no objection to the state's motion to dismiss but asked the judge to consider dismissing the case with prejudice. The judge denied the motion to dismiss, and the question of wheth-

er the motion was to be with or without prejudice was never discussed or contested in any way at the hearing. A simple request by defense counsel for the judge to consider a dismissal with prejudice hardly constitutes a real contest of any legal issue.

I agree with the result reached by the majority, however, because defense counsel failed timely to file a peremptory challenge of the judge after the judge denied the state's motion to dismiss. Once defense counsel became aware that the trial judge wanted a trial, he could no longer reasonably rely upon the prosecutor's promise that he would dismiss the case. *See* Rule 16.5, Ariz.R.Crim.P., 17 A.R.S.; *State v. Johnson*, 122 Ariz. 260, 594 P.2d 514 (1979) (prosecutor does not have sole discretion to decide whether to dismiss; the Superior Court on good cause shown may order that a prosecution be dismissed). As defense counsel failed to file a peremptory notice of a change of judge within 10 days after the June 21st hearing, the motion was not timely.

I dissent from reimposition of the death penalty. In *Poland I* this Court reversed defendant's death penalty "conviction" for lack of sufficient evidence. The United States Supreme Court has held that such an appellate reversal is the same as a factfinder's acquittal of the defendant. A "death penalty acquittal" is final for double jeopardy purposes, and the death sentence issue should not be retried, even after an entirely new trial on the guilt or innocence issue. *See* authorities cited *infra*.

The double jeopardy rule forbids retrial of a defendant who has been acquitted of the crime charged or whose conviction is reversed on appeal because of insufficient evidence. *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Bullington*, the United States Supreme Court made these principles applicable to state death sentencing proceedings when such proceedings resemble a trial. The Court later specifically held that Arizona's

death sentencing procedure is a separate trial for double jeopardy purposes, thus invoking all double jeopardy protections. *Arizona v. Rumsey,* —— U.S. ——, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). In *Arizona,* therefore, if a trial court "acquits" a defendant on the ultimate issue in the death sentencing proceeding—whether to impose the death penalty—or if this Court reverses a death penalty "conviction" because of insufficient evidence, the double jeopardy rule prohibits retrial of the death penalty issue. *Arizona v. Rumsey, supra; Bullington v. Missouri, supra.*

Our decision in *Poland I* was surely a reversal of defendant's death penalty "conviction" for insufficient evidence constituting a final acquittal of that charge. In *Poland I* the trial court found one aggravating circumstance upon which it based the death penalty: A.R.S. § 13–454(E)(6) (now § 13–703(F)(6)), that defendant committed the offense in an especially heinous, cruel, or depraved manner. Because of a mistake of law, however, the trial court failed to find the pecuniary gain aggravating circumstance, A.R.S. § 13–454(E)(5) (now § 13–703(F)(5)). On appeal, this Court thoroughly analyzed the lone aggravating circumstance supporting defendant's death penalty, and we found it nonexistent because of insufficient evidence. As a matter of common sense, then, when this Court struck down the sole aggravating factor found by the trial court to justify defendant's death penalty because of insufficient evidence, we necessarily reversed defendant's death penalty "conviction" for lack of sufficient evidence.

No other view of our *Poland I* decision is possible. As this Court does not write non-binding advisory opinions, the death sentence review in *Poland I* cannot be viewed as such. Further, even if our discussion in *Poland I* could somehow be construed as dicta, I had always believed that dicta was binding upon the parties in the case in which the dicta appears. It was certainly binding in the instant case.

The majority, however, explains our decision in *Poland I* by relying upon the law as

it stood before *Bullington* and *Rumsey.* According to the majority,

"Our holding in *Poland I,* however, was simply that the death penalty could not be based soley upon this aggravating circumstance [cruel, heinous, or depraved] because there was insufficient evidence to support it. This holding was not tantamount to a death penalty 'acquittal'."

Though perhaps correctly characterizing our holding in *Poland I,* the majority fails to see that the disposition in *Poland I* is unacceptable under current double jeopardy rules, which apply retroactively to this case. At the time of *Poland I* it was appropriate to resentence defendant, despite this Court's nullification of the sole aggravating circumstance against him. It was appropriate, however, only because Arizona's death sentencing procedure was not then considered a separate trial for double jeopardy purposes.

The United States Supreme Court has since changed the law, and now death sentencing procedures are separate trials for double jeopardy purposes. *Arizona v. Rumsey, supra; Bullington v. Missouri, supra.* Thus, in the *Poland I* death sentencing "trial" defendant was found guilty of the charge against him—whether to impose the death penalty. One basis supported that "conviction". This Court, however, found that sole basis non-existent because of insufficient evidence. Thus, just as in any other type of trial, when this Court finds the sole basis for a conviction unsupported by the evidence, we necessarily reverse that conviction for lack of sufficient evidence. Furthermore, just as in any other type of trial, such a reversal is a final acquittal for double jeopardy purposes. *Burks v. United States, supra; Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978) (applying *Burks* to the states). The majority's explanation of *Poland I* would allow appellate courts to reverse convictions for insufficient evidence and then remand to the trial court with instructions to convict the defendant

of the same charge on another basis. Such a result cannot be correct.

Furthermore, as settled by *Rumsey*, the trial court's error in not finding the pecuniary gain aggravating circumstance at the first trial in no way justifies a second sentencing proceeding. In "acquitting" the defendant of the death penalty, the trial judge in *Rumsey* made the exact legal error the trial judge made in the instant case. Nevertheless, this court and the United States Supreme Court held that the trial court's erroneous "acquittal" was final for double jeopardy purposes. As stated by the high court in *Rumsey*:

"Reliance on an error of law, however, does not change the double jeopardy effects of a judgment that amounts to an acquittal on the merits. '[T]he fact that "the acquittal may result from erroneous evidentiary rulings or erroneous interpretations of governing legal principles" * * affects the accuracy of that determination, but it does not alter its essential character.' *United States v. Scott*, 437 U.S. 82, 98, 98 S.Ct. 2187, 2197, 57 L.Ed.2d 65 (1978) (quoting *Id.*, at 106, 98 S.Ct. at 2201 BRENNAN, J., dissenting). Thus, this court's cases hold that an acquittal on the merits bars retrial even if based on legal error."

*Arizona v. Rumsey, supra*, —— U.S. at ——–——, 104 S.Ct. at 2310–2311, 81 L.Ed.2d at 171–172. As this Court effectively "acquitted" defendant of the death penalty in *Poland I*, reimposition of the death penalty was improper, despite the trial court's error in failing to find the pecuniary gain aggravating circumstance.

The majority, however, maintains that it has reached the correct conclusion because, unlike *Bullington* and *Rumsey*, defendant in this case was sentenced to death at the first trial.[1] If I could ignore the principle established in *Burks v. United States, supra*, and *Greene v. Massey, supra*, I might agree with the majority's argument. In *Burks* and *Greene*, however, the United States Supreme Court held that an appellate reversal for insufficient evidence has exactly the same double jeopardy effect as a jury acquittal. The *Burks* rationale is logical:

"In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect,

1. In support of this reasoning the majority cites *Knapp v. Cardwell*, 667 F.2d 1253, 1264–65 (9th Cir.), *cert. denied*, 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982). That case, however, is inapplicable to the instant case. In *Knapp*, a class of Arizona death row inmates brought suit challenging the constitutionality of the Arizona death sentence statute and argued that, even if constitutional, its application to them violated ex post facto laws and the double jeopardy clause.

Rejecting this argument, the Ninth Circuit Court of Appeals stated:

"The present case is clearly distinguishable from *Bullington*. First, appellants in this case, unlike *Bullington*, were sentenced to death at their original sentencing. There exists no implied 'acquittal' in the case. *See Bullington*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (Justice Powell, dissenting).
* * * * * *
"In addition, the Arizona sentencing procedure, both before and after *Watson*, bears less resemblance to a trial than did that of Missouri. For example, the Arizona sentencing decision is made by the judge rather than the jury, and the procedure for presenting the evidence in Arizona is much less trial-like. These differences lend weight to our holding that in this case no implied acquittals have been shown to exist."
667 F.2d at 1265.

The *Knapp* reasoning is inapplicable to this case for an important reason the majority does not acknowledge: the death sentences in *Knapp* were never reversed on appeal for insufficient evidence. The death sentence in this case was reversed on appeal for insufficient evidence thus rendering it identical to a final acquittal for double jeopardy purposes. *See Burks v. United States, supra.*

In addition, this Court and the United States Supreme Court expressly rejected the *Knapp* analysis that our death sentencing proceeding is not like a trial. *Arizona v. Rumsey, supra. State v. Rumsey*, 136 Ariz. 166, 665 P.2d 48 (1983).

e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. *See Note, Double Jeopardy: A New Trial After Appellate Reversal for Insufficient Evidence*, 31 U.Chi. L.Rev. 365, 370 (1964).

"The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble. Moreover, such an appellate reversal means that the government's case was so lacking that it should not have even been *submitted* to the jury. Since we necessarily afford absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." (emphasis in the original)

*Burks v. United States, supra,* 437 U.S. at 15–16, 98 S.Ct. at 2149–2150, 57 L.Ed.2d at 12–13.

As explained above, our decision in *Poland I* was nothing but an appellate reversal of defendant's death penalty "conviction" for lack of sufficient evidence. As established in *Burks* and reaffirmed in *Bullington,* this reversal is exactly the

same as the factfinder's acquittal of defendant on the death penalty "charge." Thus, it violated double jeopardy to retry defendant on that charge. *See Jones v. Thigpen,* 741 F.2d 805 (5th Cir.1984) (Defendant sentenced to death at the trial court, but appellate court found insufficient evidence to support that sentence. Citing *Bullington, Rumsey, Burks* and *Greene,* the court held double jeopardy prevented state from again subjecting defendant to death sentencing hearing in second trial.)[2] The majority's basis for distinguishing this case from *Bullington* and *Rumsey,* therefore, is erroneous because it concentrates only on the trial court decision while ignoring the important double jeopardy effects of our decision in *Poland I.*

Finally, I will address what I believe to be an unstated basis for the majority opinion. That is, in *Poland I,* this Court ordered an entire new trial, including both the guilt or innocence phase and the death sentencing phase. Thus, as both phases of trial are fundamentally connected to each other, if convicted, the defendant should be subject to a totally new sentencing in the second trial. Though I believe this position is entirely reasonable, the law as it now stands rejects this thinking.

First, *Bullington* established that death sentencing proceedings are wholly separate from the guilt or innocence phase for double jeopardy purposes. In *Bullington* the defendant was convicted of capital murder and sentenced to life imprisonment. The trial court granted a new trial on the guilt or innocence phase but refused to allow the state a second chance to attempt to sen-

**2.** Though *Jones v. Thigpen, supra,* is slightly distinguishable from the instant case, the distinguishing factor makes no difference. In *Jones,* appellant's death sentence was not reversed because of insufficient evidence supporting the aggravating factors but because insufficient evidence supported a finding that Jones killed, intended to kill or attempted to kill the victim. *See Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Thus, it was an insufficiency of *Enmund* evidence that spared Jones' life.

This difference is insignificant because, like this case, *Jones'* key issue was the state's insufficient evidence supporting the death penalty.

The Jones court agreed with the defendant "that *Enmund's* is a rule of evidentiary sufficiency, and that because the State failed to produce sufficient evidence of personal culpability at the first trial it is barred by the Double Jeopardy Clause from a second chance." *Jones v. Thigpen, supra* at 814. Thus, just as I believe should be the result in this case, "if the jury under *Bullington* [the judge under *Rumsey*] or an appellate court under *Burks* finds the prosecution's evidence in support of the death penalty insufficient, the defendant cannot again be made to face a possible death sentence." *Id.* at 815.

tence the defendant to death. Affirming the trial court, the United States Supreme Court held that the first death sentencing procedure was a trial for double jeopardy purposes and that the acquittal the defendant received in that trial prevented a retrial on the death sentence in the second murder trial. Thus, whether or not an appellate court grants a new trial on the guilt or innocence phase, a final acquittal in the death sentencing phase prevents a retrial of defendant on the death sentence issue.

As previously shown, then, our reversal of defendant's death sentence in *Poland I* equalled a final acquittal on that issue, and, as *Bullington* shows, that final acquittal in the first trial prevents retrial of the death sentence in the second trial.

The result I urge in this case is in no way bizarre or unheard of. It is simply a matter of logically applying existing law. Other courts have reached the exact result I argue for. In a case decided before *Bullington*, the Court of Criminal Appeals in Texas reversed the guilt or innocence phase of a defendant's trial for legal error and reversed imposition of the death penalty for insufficient evidence. *Brasfield v. State*, 600 S.W.2d 288 (Tex.Crim.App.1980). In remanding the case to the trial court, the appeals court, citing *Burks* and *Greene*, held that the defendant could not again be tried for capital murder where the state seeks the death penalty. The United States Supreme Court cited *Brasfield* in footnote 9 of *Bullington*.

In a case subsequent to *Bullington*, the presiding judge of the Texas Court of Criminal Appeals gave an able analysis of the situation confronting us today:

> "The evidence being insufficient to support the assessment of the death penalty, death is no longer an available penalty. *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); *Bullington v. Missouri*, [451] U.S. [430], 101 S.Ct. 1852, 68 L.Ed.2d 1270 (1981); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). In a capital murder case where

the evidence is insufficient to support the death penalty assessed, the reviewing court, before deciding on the proper disposition of the appeal, must determine if the guilt stage is free from reversible error. If the guilt stage is not free of such error, the cause must be reversed for such error, and upon any retrial the death penalty would not be an available penalty."

*Wallace v. State*, 618 S.W.2d 67, 74 (Tex. Crim.App.1981).

Today, however, the majority holds that a death sentence "conviction" reversed on appeal for insufficient evidence invokes no double jeopardy protections. This holding is contrary to the law established in *Arizona v. Rumsey, supra; Bullington v. Missouri, supra; Burks v. United States, supra;* and *Greene v. Massey, supra* and I, therefore, dissent. Accordingly, I would reduce defendant's sentence to life imprisonment without possibility of parole for twenty-five years.

FELDMAN, Justice:

I concur in Vice Chief Justice Gordon's special concurrence and dissent.